BERNADINE DIERKES, WHO SUES BY HERMAN DIERKES,
HER NEXT FRIEND, PLAINTIFF AND PLAINTIFF IN
ERROR, v. HAUXHURST LAND COMPANY (BODY COR-
PORATE), DEFENDANT AND DEFENDANT IN ERROR.

Submitted July 11, 1910—Decided March 11, 1911.

1. In cases where the scope of authority of a servant or agent
   depends upon disputed matters of fact, the extent of such author-
   ity is ordinarily a question for the jury.
2. The authority of an agent to do certain acts on behalf of his
   principal may be inferred from the continuance of the acts them-
   selves over such a period of time and the doing of them in such
   a manner that the principal would naturally have become cogni-
   zant of them and would have forbidden them if unauthorized.
3. Defendant, a corporation, owned a tract of land with a house
   and outbuildings thereon; and installed one W. in the house
   to keep it occupied and to report anything occurring in reference
   to the property. W. lived in the house for some years, during
   which time he habitually expelled trespassers from the property
   near the house. Plaintiff having trespassed on this part of the
   property, W. set two dogs after her, frightening her so that she
   fell over a rocky bluff and sustained injuries. *Held* that, not-
   withstanding defendant's denial of having given any authority
   to W. to expel trespassers from the grounds, such authority
   might be inferred from the course of conduct pursued by W.
   apparently without objection of defendant.

On error to the Supreme Court.

For the plaintiff in error, *Charles E. S. Simpson.*

For the defendant in error, *Edward J. Luce* and *Walter A.
Kipp.*

The opinion of the court was delivered by

PARKER, J. The plaintiff below, a girl of thirteen years, sustained serious personal injuries while upon the lands belonging to the defendant company in the county of Hudson. The property consisted of a considerable tract of land which had formerly been a large suburban homestead property, but had been abandoned as such and the title turned over to the defendant company, which was incorporated by the family interested in the property for the purpose of corporate ownership. The old house that had been the family homestead still stood on the property at the time of plaintiff's injury, and was then, and had for some time been, occupied in whole or part by a man named Wallace. The question of Wallace's relations with the owning company as a servant or employe, his duties as such and the scope of his employment, if so employed, constituted the crux of the case. The property was unfenced, in a neighborhood frequented by children; there was considerable vegetation on it, including flowers and flowering plants, and children were constantly trespassing on the property to play and pick flowers, and had done so for years. The circumstances of the plaintiff's injury, as the jury might have found them from the evidence, were that plaintiff and her companions were on the property in the rear of the house, when Wallace came out with two dogs, one large, one small, and set them on the children; that all the children ran, the dogs chasing them, and plaintiff, in her fright, fell over a cliff some twenty-five feet high, where a street had been cut through the property in the rocky formation of that locality, sustaining the injuries for which the suit was brought. The trial court ordered a nonsuit, and it is to that ruling that this writ of error is mainly, if not entirely, directed.

That the children were trespassers is not to be doubted. Some point was made of a beaten path across the property and its habitual use by many persons as constituting an implied invitation to go upon the place; but no such invitation arose from mere repetition of the trespass. Dieckman *v.* Delaware, Lackawanna and Western Railroad (November term, 1910, and to be printed in 52 *Vroom*). The duty of defendant to

plaintiff was simply the duty that it owed to a trespasser, to abstain from acts willfully injurious. Even if there had been a license or permission, so long as there was no invitation, the measure of duty would have been the same. *Vanderbeck* v. *Hendry,* 5 *Vroom* 467. And the rule is not affected by the fact that plaintiff was a child and that the place was one attractive to children. *Turess* v. *Railroad Company,* 32 *Id.* 314; *Delaware, Lackawanna and Western Railroad Co.* v. *Reich, Id.* 635.

Starting with this fundamental proposition, as applied to this case, the question at the trial was whether plaintiff's evidence tended to show a breach of this duty that was chargeable to the defendant company. If it appeared that Wallace was the servant of the defendant and that among his duties was that of ejecting trespassers from any part of the premises; and that in the performance of that duty he had undertaken to eject plaintiff and had used unnecessary force in so doing, the defendant would be liable for any injury caused by such action. *West Jersey and Seashore Railroad* v. *Welsh,* 33 *Vroom* 655; *Letts* v. *Hoboken Railroad, &c., Co.,* 41 *Id.* 358; *Bernadsky* v. *Erie Railroad Co.,* 47 *Id.* 580, this last being a case in which a dog was set upon the plaintiff. Hence, if there was evidence sufficient to go to the jury indicating that Wallace was the servant of the defendant company, and that his act in ejecting plaintiff was within the express or implied scope of his authority as such, the nonsuit was erroneous.

The alleged scope of Wallace's employment, from the defendant's standpoint, appeared in the plaintiff's case from certain interrogatories propounded by plaintiff to defendant before trial under the statute, and the answers thereto; all the interrogatories and answers being offered in evidence by plaintiff's counsel under the impression that to get the benefit of favorable answers to any interrogatories, he was obliged to offer them all in evidence; a point partially but not fully covered by the decision of this court in *Cetofonte* v. *Camden Coke Co.,* 49 *Vroom* 662, rendered some time after the trial of the case at bar. To the first interrogatory, defendant stated in part that Wallace "occupied, and with his family lived in,

a part of the mansion-house on said lands, with the assent and permission of defendant. The said lands, at said date, were not, and for several years prior to said date, had not been otherwise actually occupied by anyone." To the third interrogatory, whether defendant, on the date in question, had in its employ said Wallace as a watchman, or otherwise at said Hauxhurst Park (the place in question), defendant answered as follows:

"Answer to third interrogatory: On May 31st, 1907, Wallace lived on the property of the defendant, as is above stated. He had been a servant for many years in the Duer family, from whom defendant's said title was derived, through the mesne conveyance of Duryee, above mentioned. Wallace died on July 3d, 1907, at the age of seventy-five years. He had been a servant in the Duer family, as above stated, from his youth. The stockholders of the defendant company were practically all members of said Duer family; and, in or about 1902, Wallace, who had become too old and feeble for further service, was permitted to occupy a part of the mansion-house on the lands in question, and live there, as above stated, rent free. He was also paid a pension of $50 a month, during the rest of his life. He was asked, and expected, to report to the defendant anything coming to his knowledge that might concern the interests of the defendant in said property, and to keep the building from becoming vacant and unoccupied. He was also appointed the agent in charge of the principal office of the company, to receive service of process, &c., under the provisions of the Corporation law, and was such agent from November 4th, 1905, to the date of his death. Except, as above stated, on May 31st, 1907, and prior thereto, Wallace was charged with no duties by the defendant, performed no services for it, and was not in its employ."

If this had been all the evidence bearing on the nature of Wallace's employment and the scope of his authority, a nonsuit might be sustained on the ground that defendant had never, expressly or impliedly, authorized Wallace to eject trespassers from the premises at large; and yet even in the face of these interrogatories certain inferences against the defendant

would seem to be justified. His occupancy of the house was evidently that of a caretaker, to some extent at least; and it would be absurd to say that he had no authority, express or implied, to keep trespassers out of the house itself or to preserve it from injury; or that his "pension" was not based in part on performance of some duty as a caretaker. This duty of caretaker is plainly involved in that of keeping the building from becoming vacant and unoccupied.

If this may be inferred, the duty would naturally extend not only to the interior of the building, but to its outer walls, and for a reasonable distance around it; and such reasonable distance is to be judged in the light of the fact that the house was not a city dwelling in a row, but a detached mansion on what had been a large place, with a group of outbuildings consisting of stable, chicken house, smoke house and ice house. These would be embraced in a tract of land perhaps one hundred and fifty feet in front on Hauxhurst avenue and in rear on Valley road, and two hundred or two hundred and fifty feet deep from the rear of the house to Valley road, besides the distance from the front of the house to Hauxhurst avenue.

It cannot be said that a duty to protect this tract, with its various buildings, is to be gathered from the language of the answers to the interrogatories; but apart from that language, the presence of this man in the house as caretaker, combined with the physical situation, would impel the ordinary mind to the conclusion that he was there to prevent nuisance or damage to the buildings and the curtilage on which they stood. And it must be borne in mind that the children were playing on what might fairly be called part of this very curtilage, in rear of the house, between it and Valley road, when Wallace came out and set his dogs on them.

The natural conclusion just adverted to would be fortified, if not confirmed, by knowledge of what Wallace had been accustomed to do by way of protecting this curtilage from trespass and depredation. Plaintiff's counsel produced eleven witnesses who testified that at various times before plaintiff's injury, extending over a period of years, Wallace had perhaps not invariably, but certainly habitually, ejected similar tres-

passers by coming out after them with a stick in his hand and urging his dogs to chase them.

One witness said he had seen this at least fifty times; others said several times. Most of them testified to separate experiences in that regard. It was put in evidence that boys used to play baseball in front of the house and were driven from thence; that boys, girls and . grown people frequented the ground directly in rear and were chased with dogs from that place also.

After these eleven had testified, plaintiff's counsel said to the court: "I have a great deal of evidence along that same line," and the court responded, "I cannot control it. You will have to put in your evidence." Five more witnesses were then examined to the same effect. Two or three others were unable to testify to habitual acts of this character, and one said she never had been chased before. But a course of practice over an extended period was laid before the jury, coming from the mouths of at least fifteen witnesses.

To justify the nonsuit, the court in effect held, and was obliged to hold, that the interrogatories and answers not only failed to show any authority of Wallace to eject trespassers from the lands, but negatived any inference arising from his occupancy of the house, that he was empowered to eject trespassers from the lands around it; and that such negation was not itself overcome or qualified so that a jury might disregard it, by the evidence of Wallace's habitual ejection of trespassers for some years. Granting for the sake of argument the first proposition, we cannot accede to the second.

In cases involving the law of principal and agent, when it is sought to hold the principal for the acts of the agent and the question of agency is in issue, plaintiff must, of course, prove the agency, and that the acts complained of were within the scope of authority of the agent. This, however, is ordinarily peculiarly a jury question. *Ritchie* v. *Waller,* 63 *Conn.* 155; 27 *L. R. A.* 161, and note, *p.* 202; 26 *Cyc.* 1533, 1576, and cases cited; *Taylor* v. *New York and Long Branch Railroad, ante p.* 282. And as the fact of agency and the extent of the authority are matters peculiarly within the knowl- ·

edge of the defendant, the courts have not compelled plaintiff to call hostile witnesses to prove this element of his case, but it may be inferred from certain facts and circumstances that would fairly give rise to such an inference. It is stated, in 31 *Cyc.* 1662, that "as a general rule the fact of agency cannot be established by proof of the acts of the pretended agent, in the absence of evidence tending to show the principal's knowledge of such acts, or assent to them. Yet when the acts are of such a character, and so continued, as to justify an inference that the principal knew of them, and would not have permitted the same, if unauthorized, the acts themselves are competent evidence of agency." This, it will be observed, is not on the theory of estoppel in favor of a party contracting with the supposed agent because the conduct of the principal amounted to holding him out as such agent, but is a rule of evidence, permitting a jury to find agency as a fact and not merely estoppel to deny it. And while the question has arisen for the most part in contract cases, the rule has also been applied in actions of tort.

In *Petersen* v. *Hubbell,* 42 *N. Y. Supp.* 554, plaintiff was injured by the negligence of the driver of an express wagon belonging to the defendant or the express company that he represented. There was no question that the man driving the wagon was an employe of the company, but the question was whether he was acting in the line of his duty, for it was made clear that Bourne, who was driving, was not hired as a driver, but as an office clerk, and had undertaken to drive this wagon outside of the line of his regular duty, and with no express authority whatever, because the regular driver was absent and there was no one to take charge of the wagon but a boy of fourteen employed as a helper. The court said that if this evidence stood alone, the claim that Bourne was a mere volunteer might be well founded; but it further appearing that he had repeatedly done the same thing under similar circumstances, the court (New York Supreme Court, Appellate Division) said that "from that testimony it was competent to infer that there was an acquiescence by or on the part of this defendant in this person driving its wagon or a permission for him to

drive it, in the absence of the driver and on a regular trip. * * * The testimony of this witness was some evidence of prior acts performed by him in driving defendant's loaded wagons, knowledge of which, in the defendant, will be presumed until it be shown that those whose duty it was to send out the wagons on their regular trips, or direct that feature of the defendants' business, were unaware of such acts." On this theory, the court held there was enough evidence of implied authority in Bourne, in the absence of proof of any rule or regulation of the company or of lack of knowledge of his acts, to justify a refusal to dismiss the complaint on the ground that Bourne was not acting within the scope of his authority.

In *Peck* v. *Michigan Central Railroad,* 57 *Mich.* 3, defendant operated two lines of railroad crossing a public highway through which plaintiff was driving. These two lines were about fifty feet apart, the one nearer to plaintiff being on an overhead bridge, the further at grade. Defendant employed a flagman for the grade crossing alone, without any duty as to the overhead bridge. But the flagman, doubtless in view of the well-known tendency of horses to take fright from seeing and hearing a railroad train passing overhead, had been accustomed for some years to warn approaching drivers of the presence of trains about to cross the bridge. On this occasion, the flagman first signaled plaintiff to stop, then, in a moment, to go ahead, and as plaintiff had nearly reached the bridge a train crossed it, frightening the horse and causing plaintiff to be thrown from the buggy. The court held that it was error to direct a verdict for defendant, saying: "The flagman was the servant of defendant. Although he may have had no positive instructions to perform duties in connection with the main line, or to warn persons with teams and vehicles of the approach of trains on the main line, yet the fact that he had uniformly performed such duty for several years was competent evidence to be submitted to the jury as tending to prove that he was so acting by the express or implied assent of the defendant;" and held, that if the jury so found, the defendant would be liable for negligence of the flagman in leading

plaintiff into a place of danger whereby she was injured, in the absence of contributory negligence on her part.

We consider the rule applied in these cases to be a sound one and applicable in the present case; that from the habitual conduct of Wallace in ejecting trespassers through this protracted period, and the necessarily open manner of his doing so, the jury was entitled to infer that such conduct must have come to the knowledge of his employer, the defendant, and that having that knowledge and tacitly permitting the conduct to continue, the defendant assented to its further continuance in protection of its property, thus impliedly authorizing Wallace to eject the plaintiff; and if in so doing he used unnecessary force, the defendant, under authorities already cited, was responsible for resulting damage.

Assuming that the answers to the interrogatories negative such authority, the case merely presents a conflict of testimony on a motion to nonsuit, when the evidence making most strongly for the plaintiff is alone to be considered. *Hayward* v. *North Jersey Street Railway Co.,* 45 *Vroom* 678.

In answer to other interrogatories, defendant, on the oath of one of its officers, denied all knowledge of the dogs and that Wallace had any authority to use them. But this, if not also contradicted by the inference arising from continued use of them by Wallace, is beside the question. If his authority to eject trespassers was a question of fact within the province of the jury, as we have just held, and the jury should find that he had such authority, the unnecessary use of dogs as instruments to aid him in executing his authority was chargeable to the employer. *Bernadsky* v. *Erie Railroad Co., supra.*

Our conclusion is that the nonsuit was wrong, and the judgment is therefore reversed to the end that a *venire de novo* issue.

*For affirmance*—BERGEN, VROOM, JJ. 2.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, VOORHEES, MINTURN, BOGERT, VREDENBURGH, CONGDON, JJ. 11.